IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**JOSHUA EVANS,** an individual,

    Plaintiff,

v.

**COLORADO IRON & METAL INC.,** a Colorado corporation,

    Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff Joshua Evans ("**Mr. Evans**"), through his undersigned counsel, submits this Complaint and Jury Demand against Colorado Iron & Metal Inc., a Colorado corporation.

## PARTIES

1. Mr. Evans is an individual who resides at 3891 Mount Hope Street, Wellington, Colorado 80549.

2. Colorado Iron & Metal Inc. ("**CIM**" or the "**Company**") is a Colorado corporation. Its corporate headquarters are located at 903 Buckingham Street, Fort Collins, Colorado 80524.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Mr. Evans's claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 12101, *et seq*. This is an action authorized by, and instituted

under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* and the ADA Amendments Act of 2008 (together the "**ADA**").

4. The unlawful employment practices alleged herein were committed within the judicial district of the United States District Court for the District of Colorado. Accordingly, venue is proper in this District pursuant to 28 U.S.C. § 1391.

## ADMINISTRATIVE PROCEDURES

5. On or about December 11, 2020, Mr. Evans timely filed a Charge of Discrimination against CIM with the Equal Employment Opportunity Commission ("**EEOC**") and the Colorado Civil Rights Division ("**CCRD**").

6. On or about April 1, 2021, Mr. Evans filed an Amended Charge of Discrimination against CIM with the EEOC and CCRD, adding allegations regarding discrimination in pay.

7. On or about June 18, 2021, the CCRD issued a Notice of Right to Sue to Mr. Evans, authorizing Mr. Evans to bring the present lawsuit pursuant to Colorado's Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq.* ("**CADA**").

8. On August 3, 2021, the EEOC issued a Dismissal and Notice of Rights to Mr. Evans, which included a Notice of Suit Rights, authorizing Mr. Evans to bring the present lawsuit under the ADA.

## GENERAL ALLEGATIONS

### *Employer and Employee Information*

9. Mr. Evans is a 35-year-old man with an intellectual disability.

10. Mr. Evans's supervisors and CIM management were aware of Mr. Evans's disability.

11. Mr. Evans's disability impacts, among other things, his speech and physical movement, and is apparent to persons who interact with Mr. Evans.

12. CIM is a scrap metal recycling company with locations in Fort Collins and Loveland, Colorado.

13. CIM is an employer pursuant to CADA and the ADA and at all times material hereto has employed more than fifteen employees.

14. Mr. Evans worked for CIM from September 2006 to October 19, 2020, when he was fired.

15. Throughout his 14+ years of employment with CIM, Mr. Evans was a scrap-metal handler and laborer.

16. Mr. Evans worked at CIM's location at 903 Buckingham Street, Fort Collins, Colorado 80524 (the "**Buckingham**" location).

17. Mr. Evans never needed – nor requested from CIM – an accommodation of his disability. He was able to perform his job as scrap handler and laborer without accommodation.

18. Until 2014, CIM was owned by Kent Garvin, who also oversaw day-to-day operations.

19. Upon information and belief, in 2014, Kent Garvin sold CIM to his two nephews, Dan Garvin and Marty Garvin, who took over CIM's day-to-day operations at that time.

### *Mr. Evans Was a Loyal and Reliable Employee*

20. To say that Mr. Evans was proud to be a loyal employee of CIM would be an understatement.

21. Mr. Evans established himself as a dependable and willing employee in the 14+ years he worked at CIM. In all his time working for CIM, Mr. Evans only ever took two sick days and rarely used his available vacation days.

22. Mr. Evans regularly worked from 8:00 a.m. to 5:00 p.m., Monday through Friday and from 8:00 a.m. to noon on Saturdays.

23. Mr. Evans never turned down opportunities to work overtime.

24. At all times relevant to this matter, CIM's employee training and equipment licenses were handled by Joe Haralson ("**Mr. Haralson**") of Safety Services, a Fort Collins-based company offering workplace safety training, safety manuals, accident investigation, and workplace inspections.

25. Mr. Haralson was frequently at CIM's Buckingham location, administering training and safety classes to CIM workers and, upon information and belief, performing safety inspections on CIM's equipment.

26. On March 9, 2017, Mr. Evans received the appropriate training from Mr. Haralson and earned his Fork Lift Driver's license.

27. Mr. Evans was often asked to take on "special projects" for CIM's owners. At their request, Mr. Evans regularly shoveled snow from the sidewalks and driveways at the personal homes of CIM's owners. Mr. Evans was not compensated for this work.

28. Mr. Evans was also put to work shoveling snow at Marty Garvin's church, at Marty Garvin's direction, and without compensation.

29. Additionally, in the summer of 2019, Marty Garvin asked Mr. Evans to help him build a deck at his home. Mr. Evans was happy to assist. In exchange for his hours of manual labor, Marty Garvin gave Mr. Evans a single can of beer.

### *Mr. Evans is Paid Less than His Non-Disabled Peers*

30. Mr. Evans and several of his coworkers worked as scrap-metal handlers and general laborers.

31. The Company classifies these employees as "Laborer-non ferrous" in human resources files and records ("**Laborer**").

32. Mr. Evans was the only Laborer with a recorded disability, and was paid less than his coworkers with the same job description – Laborer.

33. At the time of his termination on October 19, 2020, Mr. Evans was earning $15.00 per hour. He had only earned that wage for approximately one week, however, having received a pay increase from $13.40 on October 14, 2020.

34. Mr. Evans had been earning $13.40 per hour since approximately November 2018.

35. CIM hired two new Laborers in 2020, one in June, the other in October.

36. CIM hired Laborer "JQ" on June 9, 2020. JQ's starting hourly pay rate was $15.00.

37. In October 2020, when Mr. Evans's hourly rate was increased to $15.00 per hour after nearly two years at $13.40, JQ's hourly rate was increased to $16.00, after just four months at $15.00.

38. CIM hired Laborer "EJ" on October 22, 2020. EJ's starting hourly pay rate was $17.00 per hour.

39. Mr. Evans was the only Laborer hired in 2006 who remained employed at CIM as of October 2020. "RK," also a Laborer, was hired in January 2005. Until his pay increase in October 2020, RK earned $20.00 per hour. RK's hourly rate was increased to $21.00 per hour when Mr. Evans's rate was raised to just $15.00.

### *Mr. Evans's Workplace Injury on October 15, 2020*

40. Scrap-metal handling involves hands-on work with odd-shaped pieces of metal with sharp edges. This work leads to a lot of scratches and scrapes.

41. Mr. Evans and his fellow Laborers occasionally suffered workplace injuries in the regular course of business handling scrap metal.

42. As part of their regular duties, Mr. Evans and his fellow Laborers used large equipment to handle scrap-metal for recycling.

43. One of these large pieces of equipment is a baler, used to compress scrap metal into rectangular bales.

44. There were two baler machines in use at the Buckingham location at the time of Mr. Evans's termination.

45. The baler Mr. Evans was operating on October 15, 2020 ("**Baler A**"), was purchased in used condition by CIM, but was new to CIM when it opened its Buckingham location in approximately 2017.

46. Baler A was known to have a mechanical defect. It arrived at CIM with this defect and, despite employees notifying management, the defect was never repaired during Mr. Evans's work at CIM.

47. Prior to October 15, 2020, Mr. Evans complained to management about the broken baler.

48. Prior to October 15, 2020, Mr. Evans raised the issue of the malfunctioning baler to Mr. Haralson during at least one of Mr. Haralson's safety inspections of the Buckingham location.

49. One day, Mr. Evans showed Mr. Haralson Baler A as it malfunctioned. Mr. Evans watched as Mr. Haralson immediately told Marty Garvin to get Baler A fixed.

50. Baler A was never fixed while Mr. Evans was employed by CIM.

51. Mr. Evans was injured while using Baler A at work on October 15, 2020.

52. Employees load Baler A with scrap-metal. The baler then compacts the scrap-metal into a condensed bale, which is easier for storage and moving. When working properly, the baler ejects the bale out of the front of the machine onto a waiting Fork Lift. Baler A, however, had a mechanical defect that regularly caused one corner of a bale not to properly compact. This flaw caused the bale to jam in the machine rather than to eject smoothly out of the baler.

53. Baler A was loaded approximately three times each day.

54. Mr. Evans estimates that Baler A jammed on a weekly basis.

55. Each day, Mr. Evans was told by shop manager Ryan Dibble ("**Mr. Dibble**") to load Baler A.  And every day, Mr. Evans did so, despite never being provided with formal training on how to use Baler A, or training on how to unload a jammed bale.

56. Mr. Dibble never asked Laborer Tony Rodriguez ("**Mr. Rodriguez**"), who does not have a documented disability, to load Baler A.  Mr. Rodriguez regularly watched over Mr. Evans as he loaded Baler A, however.

57. Mr. Rodriguez began work at CIM in February 2018.

58. Each time a bale got stuck in Baler A, Mr. Evans would seek assistance from Laborer Shawn Merrill ("**Mr. Merrill**"), who, upon information and belief, would override Baler A's safety mechanism and use a crow bar kept nearby to help eject the bale from Baler A.

59. When the bale got stuck on October 15, 2020, Mr. Evans went to Mr. Merrill for assistance, as he had always done before.  For the first time, however, Mr. Merrill told Mr. Evans he was too busy to help and that Mr. Evans should clear the bale on his own, despite never having trained on how to do so.

60. As Mr. Rodriguez watched closely, Mr. Evans worked to free the bale, which then ejected onto Mr. Evans's legs, tearing his jeans and causing a minor scrape to his leg.

61. Mr. Evans immediately went to the locker room to check his leg while Mr. Rodriguez notified management of the injury.

62. At management's direction, Mr. Evans sought medical treatment at Concentra Urgent Care, located at 620 South Lemay Avenue, Fort Collins, Colorado 80524.

63. Luckily, the scratch did not require stitches and Mr. Evans was able to return to work right away, the same day.

64. Among CIM's employees at the Buckingham location, three reported injuries in 2020.  George (last name unknown) and "Champ," (legal name unknown), both suffered workplace injuries more severe than Mr. Evans's leg scrape, and required stitches.  Both George and Champ continued to work at CIM, while Mr. Evans, whose workplace injury was less severe, was fired.

### *Mr. Evans's Termination*

65. Mr. Evans worked at CIM as scheduled and without incident on Friday, October 16, 2020.

66. On Monday, October 19, 2020, just four days after reporting his minor workplace injury, Mr. Evans was called into a meeting and told he was being fired.

67. Marty Garvin, CIM's co-owner and Vice President, told Mr. Evans he was "too dangerous" for the job and that Mr. Evans's disability made him "unsafe" and he could no longer work at CIM.

### FIRST CLAIM FOR RELIEF
**Discrimination in Violation of the ADA and CADA – Discrimination in Pay**
**42 U.S.C. § 12101,** *et seq.***, and Colo. Rev. Stat. § 24-34-401,** *et seq.*

68. Mr. Evans incorporates each of the allegations set forth above, as if fully set forth herein.

69. At all times relevant hereto, CIM was and is subject to the ADA and CADA.

70. Mr. Evans is an individual with a disability and, therefore, is a member of a protected class under the ADA and CADA.

71. At all times relevant hereto, Mr. Evans was qualified to perform the essential functions of his position as Laborer and had done so since 2006.

72. Mr. Evans's supervisors and CIM knew or reasonably should have known that Mr. Evans has a disability.

73. Mr. Evans was discriminated against based on his disability when he was paid less than Laborers who do not have disabilities.

74. Mr. Evans was paid less than newly-hired Laborers, despite having more than 14 years of experience as a Laborer at CIM, and having obtained his Fork Lift Driver's License in 2017.

75. Mr. Evans's supervisors and CIM's owners engaged in discriminatory practices with malice and/or with reckless indifference to Mr. Evans's protected rights, as set forth in the preceding paragraphs.

76. Such treatment denied Mr. Evans equal terms, conditions, and privileges of employment, thereby violating Mr. Evans's rights as guaranteed by the ADA and CADA.

77. As a result of the conduct of Mr. Evans's supervisors and CIM as above alleged, Mr. Evans has been damaged in an amount to be determined at trial, including but not limited to, damages for back pay, damages for emotional distress and pain and suffering, punitive damages, liquidated damages, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

### SECOND CLAIM FOR RELIEF
**Discrimination in Violation of the ADA and CADA – Discriminatory Termination**
**42 U.S.C. § 12101,** *et seq.***, and Colo. Rev. Stat. § 24-34-401,** *et seq.*

78. Mr. Evans incorporates each of the allegations set forth above, as if fully set forth herein.

79. At all times relevant hereto, CIM was and is subject to the ADA and CADA.

80. Mr. Evans is an individual with a disability and, therefore, is a member of a protected class under the ADA and CADA.

81. At all times relevant hereto, Mr. Evans was qualified to perform the essential functions of his position as Laborer and had done so since 2006.

82. Mr. Evans's supervisors and CIM knew or reasonably should have known that Mr. Evans has a disability.

83. Mr. Evans was discriminated against based on his disability when he was unreasonably terminated on October 19, 2020, following a minor injury and told he was being fired because his disability makes him unsafe.

84. Mr. Evans's supervisors and CIM's owners engaged in discriminatory practices with malice and/or with reckless indifference to Mr. Evans's protected rights, as set forth in the preceding paragraphs.

85. Such treatment denied Mr. Evans equal terms, conditions, and privileges of employment, thereby violating Mr. Evans's rights as guaranteed by the ADA and CADA.

86. As a result of the conduct of Mr. Evans's supervisors and CIM as above alleged, Mr. Evans has been damaged in an amount to be determined at trial, including but not limited to, damages for back pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, punitive damages, liquidated damages, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

## THIRD CLAIM FOR RELIEF
### Wrongful Discharge in Violation of Public Policy
(pursuant to Fed. R. Civ. P. 8(a), in the alternative)

87. Mr. Evans incorporates allegations from paragraphs 1 to 4, 9 to 31, and 40 to 67 above, as if fully set forth herein.

88. Mr. Evans was terminated just four days after making a workers' compensation claim which was reported to management.

89. The four-day proximity between Mr. Evans's workers' compensation claim and his termination suggests that he was terminated for exercising his job-related right to seek workers' compensation benefits.

90. As a result of his retaliatory termination, Mr. Evans has been damaged in an amount to be determined at trial, including but not limited to, damages for back pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, punitive damages, and pre- and post-judgment interest.

## FOURTH CLAIM FOR RELIEF
### Negligence

91. Mr. Evans incorporates each of the allegations set forth above, as if fully set forth herein.

92. CIM had a duty to maintain a safe workplace for its employees, including Mr. Evans.

93. CIM purchased a previously-used baler, known at the Buckingham location as Baler A.

94. CIM was put on notice by an unknown number of employees, including Mr. Evans, that Baler A had a mechanical defect that occurred on approximately a weekly basis.

95. CIM was also told by its third-party Safety Manager, Mr. Haralson, that Baler A needed to be repaired.

96. The problem with Baler A was so well-known and happened so frequently that Mr. Merrill kept a crowbar nearby Baler A for when the machine inevitably malfunctioned.

97. Baler A was not repaired prior to the October 15, 2020, incident, in which Mr. Evans was injured.

98. By failing to repair a known defect, CIM demonstrated a wonton disregard for its employees' safety, placing its employees, including Mr. Evans at an extreme degree of risk, considering the probability and magnitude of potential harm to its employees.

99. CIM advised the EEOC and CCRD in its response to Mr. Evans's Charge of Discrimination that CIM terminated Mr. Evans's employment as a result of the workplace accident on October 15, 2020, which was caused by Baler A malfunctioning.

100. If Baler A had not malfunctioned on October 15, 2020, Mr. Evans would not have been terminated by CIM.

101. CIM had actual, subjective awareness of the risk involved with the faulty baler, but nevertheless failed to repair Baler A, showing conscious indifference to the rights, safety, and welfare of its employees.

102. As a result of CIM's failure to repair Baler A, Mr. Evans was fired from his job and suffered economic damages in an amount to be determined at trial, including but not limited to, damages for back pay, lost job benefits, damages for emotional distress related to losing his job, and pre- and post-judgment interest.

103. Mr. Evans makes no claim in this lawsuit and does not seek damages for any personal injuries (as that term is used in Colorado's Workers' Compensation Act) he sustained while working at CIM.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Evans prays for entry of judgment in his favor and against CIM as follows:

  a. Economic damages, including without limitation, back pay and lost benefits;

  b. Compensatory damages, including without limitation, loss of opportunity for professional growth, incidental and consequential damages, damages for emotional distress, mental and emotional pain and suffering, inconvenience, mental anguish, loss of reputation, and non-pecuniary losses;

  c. Punitive and/or liquidated damages as allowed by law, and to be determined at trial;

  d. Reasonable attorneys' fees and costs where permitted by statute;

  e. Pre- and post-judgment interest; and

  f. Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Dated: August 27, 2021

By: /s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot, #35723
Amy M. Maestas, #46925
THE LITIGATION BOUTIQUE LLC
1720 S. Bellaire Street, Suite 520
Denver, Colorado 80222
T: 303.355.1942
F: 303.355.2199
lvanlandschoot@thelitbot.com
amaestas@thelitbot.com
**ATTORNEYS FOR PLAINTIFF JOSHUA EVANS**

**Plaintiff's Address:**
3891 Mount Hope Street
Wellington, Colorado 80549